**Affirmed in Part, Reversed in Part, and Remanded; Remittitur Suggested; and Majority Opinion in Part, Memorandum Majority Opinion in Part, and Concurring and Dissenting Opinion filed October 28, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00750-CV

**NATIONSTAR MORTGAGE LLC; HSBC BANK USA, N.A; BANK OF AMERICA, N.A; AND FIDELITY NATIONAL TITLE INSURANCE COMPANY, Appellants**

**V.**

**JOAN MAURI BAREFOOT, Appellee**

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2014-39628**

## M A J O R I T Y   O P I N I O N

This appeal requires this court to address in detail what makes a lien on real property "fraudulent" for purposes of Civil Practice and Remedies Code section 12.002 and decide for the first time what limitations period applies to claims for prohibited debt collection under Finance Code chapter 392. Tex. Fin. Code

Ann. §§ 392.001–.404. We address these discrete issues in the "opinion," and as the other issues in the case are not of significant interest to the public and practicing members of the bar, we address them in the "memorandum opinion." Tex. R. App. P. 47.2(a), 47.4.[1]

This case centers on the making and enforcement of liens on the homestead of appellant Joan Mauri Barefoot, and her counterclaims against the four appellants in this case: Nationstar Mortgage LLC; HSBC Bank USA, N.A.; Bank of America, N.A.; and Fidelity National Title Insurance Company. The trial court granted Barefoot relief on her counterclaims for (1) declaratory judgments, (2) claims involving fraudulent liens against all appellants, and (3) claims of unfair debt collection against Bank of America and Nationstar. As specifically explained in the memorandum portion of this opinion, we affirm in part and reverse in part the trial court's declaratory judgments. As to Bank of America, we affirm the trial court's award of $75,000 in mental-anguish damages. As to Fidelity, we reverse the trial court's awards of $104,000 in actual damages and $225,000 in mental-anguish damages and suggest a remittitur; if the remittitur is not timely filed, Barefoot's claims against Fidelity for fraudulent liens will be remanded for a new trial. As to HSBC and Nationstar, we reverse the trial court's awards of $100,000 and $50,000, respectively, on legal-insufficiency grounds, and remand with instructions that Barefoot take nothing in mental-anguish damages from HSBC and Nationstar. We also reverse the trial court's awards of attorney's fees and costs and remand for reconsideration.

---

[1] We realize that in civil appeals there are no unpublished, nonprecedential opinions since the promulgation of the 1997 Texas Rules of Appellate Procedure. *See* Tex. R. App. P. 47.2. But nothing prohibits the court from distinguishing discussion of a topic of general interest as an "opinion" and the remainder as a "memorandum opinion." While it is all precedent, it does not all need to be included in the *South Western Reporter* as "opinions" generally are.

# I.   WHAT IS A "FRAUDULENT" LIEN?

What makes a lien "fraudulent" for purposes of Civil Practice and Remedies Code section 12.002? *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a) ("A person may not make, present, or use a document or other record with . . . knowledge that the document or other record is . . .  a fraudulent lien[.]"). "Fraudulent" is not defined in the statute. When construing a code, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." Code Construction Act, Tex. Gov't Code Ann. § 311.011(a). *Black's Law Dictionary* provides two definitions of a "fraudulent act": "1. Conduct involving bad faith, dishonesty, a lack of integrity, or moral turpitude. 2. Conduct satisfying the elements of a claim for actual or constructive fraud."[2] *Fraudulent Act*, Black's Law Dictionary (11th ed. 2019).

In practice, courts applying the statute, including this court and our sister court in Houston, have applied a standard consistent with *Black's* first definition, i.e., a lien is fraudulent if created in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *Compare Young v. Neatherlin*, 102 S.W.3d 415, 421–22 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (even if incorrect, lien was not "fraudulent" when testimony showed filer believed it to be accurate) *with Centurion Planning Corp., Inc. v. Seabrook Venture II*, 176 S.W.3d 498, 507 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (lien "fraudulent" when created by filer "knowing . . . that the lien was invalid and intending that it be given the same legal effect as a valid lien"); *see also In re Cowin*, 492 B.R. 858, 900 (Bankr. S.D. Tex. 2013) (surveying Texas cases and concluding that liens were "fraudulent" when,

---

[2] Black's defines "actual fraud" as "[a] concealment or false representation through an intentional or reckless statement or conduct that injures another who relies on it in acting" and "constructive fraud" as "[u]nintentional deception or misrepresentation that causes injury to another." *See Fraud*, Black's Law Dictionary (11th ed. 2019).

among other things, they "were created with a fraudulent purpose").[3] Accordingly, when analyzing whether a lien is fraudulent, we will consider whether it was

[3] *See also Walker & Assocs. Surveying, Inc. v. Roberts*, 306 S.W.3d 839, 849 (Tex. App.—Texarkana 2010, no pet.) (drawing distinction between document that is "factually inaccurate in some respect and one that is attempting to perpetrate a fraud" and explaining that lien is not necessarily fraudulent even if it is "invalid and unenforceable as filed"); *Taylor Elec. Servs., Inc. v. Armstrong Elec. Supply Co.*, 167 S.W.3d 522, 531 (Tex. App.—Fort Worth 2005, no pet.) (making lien for knowingly inflated amount is fraudulent under section 12.002). At various points in their briefing, Fidelity and the other appellants argue for a definition of "fraudulent" that includes the elements of certain causes of action for fraud, including detrimental reliance and a duty to disclose. It makes little sense, however, to graft the elements of a fraud cause of action onto section 12.002. The statute provides the elements to satisfy liability for a claim involving a fraudulent lien; if the legislature had intended that additional elements must be proven, we would expect it to have said so. *See* Code Construction Act, Tex. Gov't Code Ann. § 311.011(a) "Words and phrases shall be read *in context . . .*") (emphasis added). Likewise, applying a strict definition of "fraudulent" would be at odds with the purpose of the statute. According to the House Research Organization's bill analysis:

> CSHB 1185 is needed to help combat persons who have clogged the state's legal system with fraudulent documents causing innocent victims to spend time and money to clear their names and property. This "paper terrorism" is a growing statewide problem, estimated to have already cost hundreds of thousands of dollars. It must be addressed both in criminal and civil law.

> Individuals and groups, some denying the authority of the state government and Texas courts, have issued bogus judgments from nonexistent courts and filed fraudulent liens and other documents in legitimate courts and with the secretary of state. Liens and judgments that have been filed against both real and personal property can go unnoticed until a person tries to sell property or obtain credit. Having the judgments or liens removed usually involves hiring a lawyer and incurring considerable trouble and expense. CSHB 1185 would provide tools for fighting this problem and remedies for persons who have been harmed.

House Research Org., Bill Analysis, Tex. H.B. 1185, 75th Leg., R.S. (1997). The legislative history addresses liens that are fraudulent in the sense that they are made in bad faith, as opposed to fraudulent in the sense they strictly comply with the elements of a fraud claim. While fraud occurs when (1) a party makes a material misrepresentation, (2) the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, (3) the misrepresentation is made with the intention that it should be acted on by the other party, and (4) the other party justifiably relies on the misrepresentation and thereby suffers injury, Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 105.2 (2018), elements such as justifiable reliance are not included in section 12.002 and will not necessarily be relevant to whether a lien is "fraudulent" for purposes of the statute.

created in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *See Fraudulent Act*, Black's Law Dictionary (11th ed. 2019) (fraudulent act "involve[es] bad faith, dishonesty, a lack of integrity, or moral turpitude").

## II. LIMITATIONS PERIOD FOR CHAPTER-392 CLAIMS

As it appears to be a matter of first impression in this court, we next address Bank of America's argument that a two-year statute of limitations applies to claims of improper debt collection under Finance Code chapter 392 which does not specify a limitations period. Bank of America cites cases, discussed further below, applying to chapter 392 the two-year limitations period found in Civil Practice and Remedies Code section 16.003(a), which states:

> Except as provided by Sections 16.010, 16.0031, and 16.0045, a person must bring suit for trespass for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another, personal injury, forcible entry and detainer, and forcible detainer not later than two years after the day the cause of action accrues.

Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a). The plain language of section 16.003(a), however, does not explicitly mention debt collection or otherwise include debt collection in its scope. As the United States District Court for the Western District of Texas explains, "[o]n its face" the language of section 16.003 does not apply to a suit for unlawful debt collection under chapter 392: "Unless the legislature intended 'debt collection' to be defined enormously broadly, debt collection is not properly characterized as a 'trespass,' 'conversion of personal property,' 'personal injury,' 'forcible entry,' or 'forcible detainer.'" *Vine v. PLS Fin. Services, Inc.*, No. EP-16-CV-31-PRM, 2018 WL 456031, at *17 (W.D. Tex. Jan. 16, 2018). Based on this analysis, the *Vine* court applied the residual four-year limitations period to chapter 392 claims. *See* Tex. Civ. Prac. & Rem. Code Ann.

5

§ 16.051 ("Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues.").

By contrast, the cases cited by Bank of America applying a two-year limitations period do not contain a substantive analysis of the language of section 16.003 and its applicability to chapter 392. In *Duzich v. Marine Office of America Corp.*, a case decided before the enactment of chapter 392, the Corpus Christi–Edinburgh Court of Appeals listed claims for "unfair debt collection practices" among other causes of action before simply stating, "Each of these causes have two year statutes of limitations." 980 S.W.2d 857, 872 (Tex. App.—Corpus Christi–Edinburgh 1998, pet. denied) (citing, *inter alia*, Tex. Civ. Prac. & Rem. Code Ann. § 16.003). Bank of America also cites *Onabajo v. Household Financial Corp. III*, No. A-18-CV-233-LY-ML, 2018 WL 6739070, at *9 (W.D. Tex. Nov. 19, 2018).[4] The *Onabajo* court concluded that a two-year limitations period applied to chapter-392 claims, again without substantive analysis and citing section 16.003 along with *Galindo v Snoddy*, 415 S.W.3d 905, 911 (Tex. App.—Texarkana 2013, no pet.) and *Clark v. Deutsche Bank National Trust Co.*, 719 F. App'x 341, 343 (5th Cir. 2018). Neither *Galindo* nor *Clark*, however, contains any substantive analysis either. *Galindo* simply stated that "[t]he parties agree that the two-year statute of limitations applies to all of Galindo's claims," including chapter-392 claims, before citing section 16.003(a). 415 S.W.3d at 911. Likewise, *Clark* applied a two-year limitations period to chapter-392 claims without explanation, simply citing section 16.003(a) and *Galindo*. *Clark*, 719 F. App'x at 343 & n.1.

Agreeing with the *Vine* court that, by its plain terms, the two-year limitations

---

[4] *Report and recommendation adopted*, No. 1:18-CV-233-LY, 2019 WL 2565247 (W.D. Tex. Mar. 26, 2019), *aff'd*, 795 Fed. App'x 258 (5th Cir. 2020).

period in Civil Practice and Remedies Code section 16.003 does not apply to prohibited-debt-collection claims under Finance Code chapter 392, we conclude the residual four-year statute of limitations applies to chapter-392 claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051.

We address the remainder of the parties' issues in the form of a memorandum opinion. Tex. R. App. P. 47.2(a), 47.4. As explained in further detail below, we reverse the trial court's judgment in part, remanding both with instructions and for further proceedings; we affirm in part; and we suggest a remittitur. *See* Tex. R. App. P. 46.3 ("The court of appeals may suggest a remittitur.").

*    *    *    *

# MEMORANDUM MAJORITY OPINION

After the first phase of a bifurcated trial, the trial court signed an interlocutory judgment granting relief on Barefoot's claims for declaratory judgments under the Uniform Declaratory Judgments Act (UDJA)[5] against all appellants, violations of Civil Practice and Remedies Code section 12.002[6] governing fraudulent liens against all appellants, and violations of Finance Code chapter 392[7] governing prohibited debt collection against appellants Bank of America and Nationstar. After the second phase of trial, the trial court signed a final judgment assessing attorney's fees, prejudgment interest, and costs against all appellants.

In three separate briefs, the four appellants challenge the above judgments. We take the following action on the trial court's final judgment:

---

[5] Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011.

[6] Tex. Civ. Prac. & Rem. Code Ann. § 12.002.

[7] Tex. Fin. Code Ann. §§ 392.301, .303, .304.

- Regarding declaratory relief, we (1) affirm the trial court's determination that the security instruments at issue are void but construe this claim as a quiet-title action instead of a UDJA action, (2) reverse the trial court's declaratory judgment that defendants forfeit the principal and interest associated with the security instruments and remand with instructions that Barefoot take nothing by this claim,[8] and (3) affirm the trial court's declaratory judgment that HSBC is not entitled to subrogation but reverse as to the other appellants for want of a justiciable controversy, with instructions that Barefoot take nothing on this claim from Fidelity, HSBC, and Nationstar.

- As to Fidelity, we affirm as to liability under section 12.002 (fraudulent liens), reverse as to actual damages under section 12.002, and suggest a remittitur; if the suggested remittitur is not filed, this claim will be remanded for a new trial.

- As to Bank of America, we reverse as to liability under section 12.002 (fraudulent liens) and remand with instructions that Barefoot take nothing from Bank of America by this claim, affirm as to liability under chapter 392 (prohibited debt collection), and affirm as to actual damages.

- As to HSBC, we reverse as to liability under section 12.002 (fraudulent liens) and remand with instructions that Barefoot take nothing from HSBC by this claim.

- As to Nationstar, we reverse as to liability under section 12.002 (fraudulent liens) and chapter 392 (prohibited debt collection) and remand with instructions that Barefoot take nothing from Nationstar by these claims.

- We reverse the trial court's awards of attorney's fees, with instructions on remand that the trial court reconsider the awards of fees as to Fidelity, HSBC, and Bank of America, and that Barefoot take nothing from Nationstar in attorney's fees.

- We reverse the trial court's awards of costs and remand for

---

[8] While this court is authorized to render the judgment that the trial court should have rendered, under circumstances when remand is necessary for additional proceedings and for efficiency's sake, we remand with instructions for the trial court to render partial judgment in accordance with our judgment and conduct such additional proceedings. *See* Tex. R. App. P. 43.2, 43.3.

reconsideration.

## III.  BACKGROUND

### A. Findings of fact and conclusions of law

The following is taken primarily from the trial court's findings of fact and conclusions of law.[9] In 1986, the property in question was conveyed by warranty deed to Barefoot, Barefoot's mother Joan Maynord, and Joan's husband Robert Maynord, each with an undivided one-third interest in the property as tenants in common. Barefoot moved into the property and treated it as her homestead. When Robert died in 1993, his one-third interest in the property passed to his three children. In 2004, Joan conveyed by quitclaim deed[10] her one-third interest in the property to Barefoot. Joan also executed, as trustee of the Maynord Family 1986 Trust, a trust set up by Robert and Joan, a quitclaim deed transferring Robert's interest in the property. Unbeknownst to Barefoot, however, Robert's interest in the property had never been conveyed to the Maynord Family Trust; rather, it had passed to Robert's three children.

Believing she was the sole owner of the property as a result of the quitclaim deeds, Barefoot took out a home-equity loan on the property in 2005. In conjunction with the loan, Barefoot executed a "TEXAS HOME EQUITY

---

[9] As above, trial was bifurcated into two phases, with the first phase addressing liability and damages, and the second phase addressing attorney's fees. Judge Caroline Baker presided over the first phase. After she signed the interlocutory judgment on the first phase, her term of office ended. Judge Baker later signed findings of fact and conclusions of law concerning the first phase of trial, as authorized by Civil Practice and Remedies Code section 30.002(a). Tex. Civ. Prac. & Rem. Code Ann. § 30.002(a) ("If a . . . judge's term of office expires . . . during the period prescribed for filing . . . findings of fact and conclusions of law, the judge may . . . file findings of fact and conclusions of law in the case.").

[10] "A warranty deed to land conveys property; a quitclaim deed conveys the grantor's rights in that property, if any." *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 486 (Tex. 2005). Quitclaim deeds "are commonly used to convey interests of an unknown extent or claims having a dubious basis." *Id.* (quotation and footnote omitted).

9

SECURITY INSTRUMENT (First Lien)," which the parties and trial court refer to as the 2005 Instrument. As part of the closing on the 2005 transaction, Fidelity issued a title commitment that stated that title to the property appeared to be vested in both Barefoot and Robert, but did not share this document with Barefoot. Despite its knowledge that Barefoot was the sole borrower on the loan but not the sole owner of the property, Fidelity closed the 2005 transaction and recorded the 2005 Instrument with the Harris County Clerk.

In 2007, Barefoot took out a second home-equity loan on the property. As part of the transaction, the 2005 loan was paid off. Barefoot again executed a "TEXAS HOME EQUITY SECURITY INSTRUMENT (First Lien)," which the parties and trial court refer to as the 2007 Instrument. Fidelity issued, but did not share with Barefoot, a title commitment stating that title to the property was vested in Barefoot, Robert, and Joan. Nonetheless, Fidelity closed the 2007 transaction and recorded the 2007 Instrument with the Harris County Clerk.

In closing the 2005 and 2007 transactions, Fidelity did not disclose to Barefoot any information indicating that she was not the sole owner of the property. All of the documents Fidelity provided to Barefoot at the closings indicated that she was the sole owner of the property.

In 2011, Barefoot was unable to continue making payments on the 2007 loan. The servicer of the loan at this time was Bank of America. Bank of America advised Barefoot to sell the property. Barefoot located a real-estate agent, moved out of the property, and found a buyer. She also turned off the water at the property. As part of the sale, the buyer attempted to obtain title insurance, but Stewart Title Guarantee Company would not issue a policy because title in the property was not vested solely in Barefoot. Barefoot contacted Fidelity to issue a title-insurance policy so the sale could be completed, but Fidelity refused on the

grounds that title was not solely vested in Barefoot. In March 2012, Fidelity issued a title commitment for the property showing that title was not solely vested in Barefoot.

Barefoot informed multiple employees of Bank of America that a sale could not be conducted because she was not the sole owner of the property. Despite this knowledge, Bank of America sent Barefoot letters attempting to collect loan payments, including communications from its counsel threatening foreclosure. In November 2012, Bank of America along with lender HSBC initiated a foreclosure action on the property under Texas Rule of Civil Procedure 736. Tex. R. Civ. P. 736. The trial court denied the application for foreclosure.

Nationstar took over from Bank of America as the loan servicer in 2013 and continued to attempt to enforce the 2005 and 2007 Instruments. In 2014, HSBC, by and through counsel retained for it by Fidelity, filed this lawsuit seeking declarations concerning enforceability of the 2007 Instrument and subrogation; Barefoot filed the counterclaims discussed above. The morning of trial, HSBC abandoned its claims, and trial proceeded solely on Barefoot's counterclaims.

**B. Judgment**

As to ownership of the property, the trial court determined that Barefoot and three of Robert's children own the property as tenants in common, with Barefoot owning a two-thirds undivided interest and each of Robert's three children owning a one-ninth undivided interest. As these determinations have not been challenged by appellants, ownership of the property is not at issue in this appeal.

In addition, as relevant to this appeal, the trial court's judgment granted the following relief:

- Declaratory judgments that (1) the 2005 and 2007 Instruments

are void, (2) appellants forfeit the principal and interest in connection with the 2005 and 2007 Instruments, and (3) appellants are not entitled to subrogation.

- Judgments that the appellants each violated Civil Practice and Remedies Code section 12.002 governing fraudulent liens.

- Judgments that Bank of America and Nationstar each violated Finance Code chapter 392 prohibiting certain debt-collection practices.

- Actual damages from Fidelity in the amount of $104,000 for loss of market value to the property due to water damage following the unsuccessful sale.

- Mental-anguish damages from Fidelity ($225,000), Bank of America ($75,000), HSBC ($100,000), and Nationstar ($50,000).

- Attorney's fees, costs, and prejudgment interest from all appellants.

## IV.   STANDARD OF REVIEW

A trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). Conclusions of law are reviewed de novo and will be upheld if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

## V.   ARE THE INSTRUMENTS VOID?

We next address an argument common to each appeal. In one form or another, each appellant challenges the trial court's determination, couched as a declaratory judgment, that the 2005 and 2007 Instruments are "void ab initio

because the[y] violate the Texas Constitution."[11]

Article XVI, section 50 of the constitution protects the homestead from foreclosure for the payment of debts subject to eight exceptions. *See* Tex. Const. art. XVI, § 50(a). Relevant to this case, section 50(a) provides:

> The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for:
>
> . . .
>
> > (6) an extension of credit that:
> >
> > > (A) is secured by a voluntary lien on the homestead created under a written agreement *with the consent of each owner* and each owner's spouse[.]

*Id.* (emphasis added). Each appellant argues that Barefoot did not meet her burden to prove the instruments are void because she presented no evidence that the other owners of the property did not consent to either instrument.

It is undisputed that Barefoot was the sole borrower listed on the instruments and the sole signatory to the instruments, even though she was not the sole owner of the property. The evidence also shows that Barefoot believed herself to be the sole owner of the property at the time she signed the instruments. This is, at the very least, some evidence that the co-owners of the property did not consent to the instruments; the trial court could reasonably infer from this evidence that the co-owners never knew about Barefoot's home-equity loans, and accordingly had no opportunity to consent (or object) to the instruments. Indeed, a 2012 email from Stewart Title to Barefoot's real-estate agent states, "When talking to Ms. Barefoot

---

[11] The supreme court has explained that "a lien securing a constitutionally noncompliant home-equity loan is not merely voidable; under section 50(c), such a lien is not valid unless and until the defect in the loan is cured." *Kyle v. Strasburger*, 522 S.W.3d 461, 465 (Tex. 2017) (citing *Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542, 548 (Tex. 2016)).

she indicated that she didn't have any idea where any of [Robert's] children[, the co-owners,] were."

Appellants argue it is not enough to offer evidence of an absence of consent of co-owners; instead, they contend that Barefoot was required to show some affirmative non-consent by the other owners. However, no such requirement is found in the text of the constitution, and we decline to impose it absent literal authority to do so. *See Garofolo v. Ocwen Loan Servicing, LLC*, 497 S.W.3d 474, 477 (Tex. 2016) ("[W]hen interpreting our state constitution, we rely heavily on its literal text and give effect to its plain language."). Rather, section 50(a) simply states that a voluntary lien on the homestead must be "created under a written agreement with the consent of each owner." The evidence here is legally sufficient to show that not all owners consented.

The only contrary evidence that appellants point to is language in affidavits signed by Barefoot in closing on the 2005 and 2007 loans that "[t]he extension of credit is secured by a voluntary lien on the property created under a written agreement with the consent of all owners and all spouses of owners, and execution of this Texas home equity affidavit and agreement is deemed evidence of such consent." However, the evidence also shows that, during the period between preparation of the quitclaim deeds in 2004 and the attempted sale of the property in 2012, Barefoot believed herself to be the sole owner of the property. Under these circumstances, the trial court could have determined that the affidavits do not show that the other owners consented, but rather simply reflect that Barefoot believed herself to be the sole owner of the property.

We conclude the trial court did not reversibly err in its judgment that the 2005 and 2007 Instruments are void. We turn next to whether this judgment is properly characterized as a UDJA declaratory judgment. Appellants argue it

14

instead should be construed as a quiet-title action, for which attorney's fees are not recoverable. We agree. Our court has previously held that a claim that another party's purported right to a property is "void" is properly characterized as a quiet-title claim for which attorney's fees are not recoverable, precluding an award of attorney's fees under the UDJA. *Gutierrez v. Lorenz*, No. 14-18-00608-CV, 2020 WL 1951606, at \*6 (Tex. App.—Houston [14th Dist.] Apr. 23, 2020, no pet.) (mem. op.); *see also Starbranch v. Crowell*, No. 01-15-00429-CV, 2016 WL 796836, at \*2 (Tex. App.—Houston [1st Dist.] Mar. 1, 2016, no pet.) (mem. op.) ("Attorney's fees are not available in a suit to quiet title or remove cloud from title, and . . . a declaratory judgment action may not be used solely to obtain attorney's fees that are not otherwise authorized by statute."). We conclude that attorney's fees are not recoverable concerning the trial court's determination that the 2005 and 2007 Instruments are void.

We next address each appellant's issues.

## VI.    FIDELITY'S APPEAL

In four issues on appeal, Fidelity contends the trial court reversibly erred by (1) determining Fidelity violated Civil Practice and Remedies Code section 12.002 governing fraudulent liens, (2) awarding actual damages for the property's loss of market value, (3) awarding mental-anguish damages, and (4) awarding attorney's fees.

## A. Fraudulent liens under Civil Practice and Remedies Code section 12.002

In issue 1, Fidelity argues that the evidence is insufficient to support the trial court's determination that Fidelity violated Civil Practice and Remedies Code section 12.002(a). Section 12.002(a) provides:

> A person may not make, present, or use a document or other record with:

(1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

(2) intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3) intent to cause another person to suffer:

(A) physical injury;

(B) financial injury; or

(C) mental anguish or emotional distress.

Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a). As explained above, when analyzing whether a lien is fraudulent, we will consider whether it was created in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *See* section I, *supra*.

Fidelity argues that the evidence is insufficient to support the trial court's determination that Fidelity violated Civil Practice and Remedies Code section 12.002(a) governing fraudulent liens. Fidelity does not contest the trial court's findings that it knew there were other owners of the property yet closed the home-loan transactions and filed the 2005 and 2007 Instruments[12] which listed Barefoot as the sole owner in violation of the Texas Constitution. Likewise, Fidelity does not challenge the trial court's findings that it concealed this information from Barefoot and showed her only documents indicating she was the sole owner of the property when closing the 2005 and 2007 transactions. These findings indicate that the liens were fraudulent, that is, created in bad faith or with

_____

[12] Neither Fidelity nor the other appellants contest that the 2005 and 2007 Instruments are "liens" for purposes of section 12.002.

16

dishonesty, a lack of integrity, or moral turpitude. *See Fraudulent Act*, Black's Law Dictionary (11th ed. 2019); *see also Centurion Planning Corp.*, 176 S.W.3d at 507.

Instead, Fidelity first argues that it did not have a duty to disclose to Barefoot there were other owners of the property. As explained in footnote 3, *supra*, it is not necessary to analyze the elements of a claim of fraud by nondisclosure to determine whether Fidelity violated section 12.002. Whether or not Fidelity had a duty to disclose the existence of other owners to Barefoot is not dispositive of whether it made, presented, or used a fraudulent lien. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a).

Fidelity next argues that the liens at issue were not void, and accordingly not fraudulent, because Barefoot did not present evidence of the affirmative nonconsent of the other owners of the property. As addressed in section V, *supra*, we conclude the constitution contains no requirement that Barefoot prove the affirmative nonconsent of other owners to show the instruments were void. Rather, it was enough that she presented some evidence that she was the only one of the owners that consented to the instruments. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a).

Fidelity next argues that, even if it knowingly made, presented, or used a fraudulent lien, Barefoot did not prove that Fidelity did so with the intent to cause her injury as required by the third element of section 12.002(a). *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a)(3). Specifically, Fidelity contends the trial court's "conclusion that Fidelity intended to cause Barefoot financial injury or mental anguish is unsupported by the evidence." Fidelity does not challenge any specific finding or conclusion in this regard.

The trial court determined in two conclusions of law that Fidelity intended to

17

cause Barefoot financial injury:

> 81. Fidelity intended to cause Barefoot financial injury by having her go forward with closing on the two transactions so Fidelity could collect title insurance premiums and closing costs, which became part of the balance of each of the fraudulent loans.

> 82. Fidelity additionally intended to cause Barefoot financial injury by seeking to give the 2005 and 2007 Instruments legal effect and foreclose on the Property by filing the Lawsuit on HSBC's behalf despite Fidelity's knowledge that both instruments are fraudulent liens against the Property.[13]

While Fidelity does not explicitly challenge either conclusion in its brief, as relevant to conclusion 81, Fidelity argues that the fact that it collected title-insurance premiums and closing costs as part of the 2005 and 2007 transactions is no evidence that it intended to cause Barefoot financial injury. We agree. While Barefoot was assessed these charges, Fidelity's actions also enabled Barefoot to procure the loans in question, which presumably she would not have sought were they against her financial interest. Under these circumstances, the mere fact that Fidelity charged premiums and costs does not permit an inference that, in so doing, it intended to cause Barefoot financial harm by preparing and filing fraudulent liens in conjunction with the 2005 and 2007 transactions. *See Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) (inference is not reasonable if evidence is susceptible to multiple, equally probable inferences, requiring factfinder to guess to reach conclusion).

Fidelity, however, does not sufficiently challenge conclusion 82, in which the trial court determined that Fidelity "intended to cause Barefoot financial injury by seeking to give the 2005 and 2007 Instruments legal effect and foreclose on the

---

[13] While categorized as "conclusions of law," these determinations may be better categorized as findings of fact, given that "[i]ntent is a fact question uniquely within the realm of the trier of fact." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

18

Property by filing the Lawsuit on HSBC's behalf despite Fidelity's knowledge that both instruments are fraudulent liens against the Property." Fidelity does not address this conclusion at all in its discussion of section 12.002, and only obliquely challenges the conclusion in the section of its brief addressing mental-anguish damages, in which Fidelity states, "no evidence was adduced, and no findings of fact identify Fidelity as being involved in 2012 onward with any collection process, failed short sale, foreclosure, or attempts to enforce or collect on the liens." This argument disregards conclusion 82, which addresses Fidelity's involvement in the filing of the instant lawsuit.[14] Moreover, Fidelity's argument that there is no evidence of its involvement in enforcement of the instruments or foreclosure contradicts the evidence, at least as to the 2007 Instrument.[15] The record includes a letter from Fidelity, dated December 24, 2014, to the Texas Department of Insurance. In the letter, Fidelity represents that HSBC, as holder of the 2007 Instrument, had filed a claim with Fidelity based on HSBC's unsuccessful attempt to foreclose on Barefoot's property, and that Fidelity had, "as an accommodation, retained counsel on behalf of the insured lender [HSBC] to establish the enforceability of the 2007 [instrument]." This evidence rebuts Fidelity's argument that it had no involvement in any enforcement or foreclosure proceedings relating to the liens at issue, and Fidelity does not otherwise challenge conclusion 82. *Cf. Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 682 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (appellate court will overrule challenge "when more than one legal conclusion independently supports a

---

[14] Fidelity does not challenge this finding as barred by the judicial-proceedings privilege, and accordingly we do not address the potential applicability of that defense. *See Landry's, Inc. v. Animal Legal Def. Fund*, No. 19-0036, 2021 WL 2021130, at *3–6 (Tex. May 21, 2021) (judicial-proceedings privilege is "defense" that may be waived).

[15] To the extent the trial court erred by including the 2005 Instrument in conclusion 82, any such error is immaterial, given that, by the time this lawsuit was initiated in 2014, the 2005 Instrument had been paid off by the 2007 Instrument.

judgment or ruling, but the appellant challenges only one of those legal conclusions on appeal") (citing *Midway Nat'l Bank v. West Texas Wholesale Supply Co.*, 453 S.W.2d 460, 460–61 (Tex. 1970)).

Likewise, Fidelity does not challenge finding of fact 52, which states that "Defendants," including Fidelity, pursued this lawsuit "with the intent for the Property to be foreclosed." Under these circumstances, the trial court could have inferred that intent to foreclose on the property constitutes intent to cause financial harm, given that foreclosure would necessarily cause Barefoot to lose her homestead. *See Taylor Elec. Services, Inc. v. Armstrong Elec. Supply Co.*, 167 S.W.3d 522, 528 (Tex. App.—Fort Worth 2005, no pet.) (intent to cause injury under section 12.002 can be proven by direct or circumstantial evidence). We conclude that Fidelity has not met its burden to show the trial court reversibly erred by concluding Fidelity intended to cause Barefoot financial injury. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a)(3)(B).

We overrule Fidelity's issue 1.

## B. Loss-of-market-value damages

In its issue 2, Fidelity challenges the trial court's award against it for actual damages for loss of market value to the property. Section 12.002(b) provides for recovery of actual damages for violations of subsection (a). Tex. Civ. Prac. & Rem. Code Ann. § 12.002(b). Actual damages are those damages recoverable under common law. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). At common law, actual damages are either "direct" or "consequential." *Id.* Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *Id.* Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *Id.* Consequential

damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. *Id.*

The trial court determined that Fidelity was liable for actual damages of $104,000 for loss of market value to Barefoot's property due to water damage following the attempted 2012 sale based on Barefoot's claims that the sale would not have been attempted, and accordingly the water damage would not have occurred, had Fidelity not facilitated the void liens in 2005 and 2007. As explained above, the conduct giving rise to Fidelity's liability is set forth in conclusion of law 82, which addresses Fidelity's involvement in the instant lawsuit beginning in 2014. We conclude the 2012 water damage could not have "resulted from" Fidelity's conduct in 2014 and later. *See Arthur Andersen & Co.*, 945 S.W.2d at 816.

We sustain Fidelity's issue 2 challenging the trial court's award of $104,000 in actual damages for loss of market value.

## C. Mental anguish

In its issue 3, Fidelity challenges the trial court's award against it of $225,000 in mental-anguish damages. To support an award of actual damages for mental anguish, there must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Mental anguish is only compensable if it causes a "substantial disruption in . . . daily routine" or "a high degree of mental pain and distress." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). "Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required." *Service Corp. Intern. v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011).

21

Barefoot cites numerous portions of her testimony in support of her recovery for mental anguish. The following examples involve Fidelity:

- after an "ugly" conversation with a Fidelity representative in the midst of the attempted sale in 2012, she so felt "so upset that it was like, okay, I just have to go higher up"; and

- when she received an email from Fidelity with its 2012 title commitment showing she was not the sole owner of the property, she felt "enraged."

Barefoot also testified that, when she saw the water damage to her house in 2012, which the trial court attributed to Fidelity in awarding actual damages, she felt "[l]ike just I can't take another thing" and "overwhelmed."

As above, we view the trial court's award of mental-anguish damages in light of the conduct for which Fidelity was properly held liable. Here, that conduct was involvement in this lawsuit beginning in 2014. In the testimony summarized above, however, Barefoot does not offer any evidence of mental anguish resulting from Fidelity's actions in 2014 or later. *See Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 861 (Tex. 1999) (mental anguish must be caused by defendant's conduct).

We sustain Fidelity's issue 3.

**D. Remittitur**

As a result of our determinations that Barefoot is not entitled to actual damages from Fidelity for either loss of market value or mental anguish, we necessarily reverse the total award of actual damages stemming from Fidelity's violation of Civil Practice and Remedies Code section 12.002(a).[16] Section 12.002,

---

[16] While not specifically requested by Fidelity, we also reverse the trial court's award of prejudgment interest on the damages award, as this relief is fairly encompassed by Fidelity's issues challenging damages. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 898

22

however, does not require a plaintiff to prove damages to recover. Instead, "[a] person who violates Subsection (a) . . . is liable to each injured person for: (1) the greater of: (A) $10,000; or (B) the actual damages caused by the violation[.]" Tex. Civ. Prac. & Rem. Code Ann. § 12.002(b)(1).

A court of appeals may exercise its authority to suggest a remittitur when there is insufficient evidence to support the full amount of an award, but sufficient evidence to support a lesser award. Tex. R. App. P. 46.3; *see Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987) ("If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict. The party prevailing in the trial court should be given the option of accepting the remittitur or having the case remanded.").

Here, the evidence is legally insufficient to support the trial court's combined award of $329,000 in loss-of-market-value and mental-anguish damages for Fidelity's violation of section 12.002(a). The evidence that Fidelity violated section 12.002(a), however, is sufficient to support an award of $10,000 by the statute's express terms. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(b)(1). Accordingly, we suggest to Barefoot a remittitur of $319,000. If timely accepted, we will modify the trial court's judgment to reflect the remittitur and an award of $10,000; otherwise, Barefoot's claim against Fidelity for violation of section 12.002 shall be reversed and remanded for a new trial as to liability and damages. Tex. R. App. P. 46.3; *see Larson*, 730 S.W.2d at 641; *see also* Tex. R. App. P. 44.1(b) (appellate court "may not order a separate trial solely on unliquidated damages if liability is contested"); *Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383

---

(Tex. 2000) ("Prejudgment interest falls within the common-law meaning of 'damages.'"); *see also Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 353 (Tex. App.—Dallas 2004, pet. denied) ("[B]ecause the Court is reversing the award of mental anguish damages, we remand the award of pre-judgment interest to the trial court for recalculation.").

S.W.3d 150, 152 (Tex. 2012) (applying Rule 44.1(b)).

## E. Attorney's fees

In its issue 4, Fidelity challenges the trial court's award of attorney's fees against it.

### 1. Statutes authorizing fees

We first address Fidelity's argument concerning the statutory bases for attorney's fees. As pertaining to Fidelity, the trial court's judgment grants Barefoot relief under two statutes authorizing an award of attorney's fees, the UDJA and section 12.002. *See* Tex. Civ. & Rem. Code Ann. §§ 12.002(b)(3), 37.009.

As above, under the UDJA, the trial court granted Barefoot the following declarations: (1) the 2005 and 2007 Instruments are void; (2) "Defendants" forfeit all principal and interest in the 2005 and 2007 Instruments; and (3) "Defendants" are not entitled to subrogation pertaining to the 2005 and 2007 Instruments.

As explained in section V, *supra*, we conclude attorney's fees are not recoverable for the first of the trial court's declarations. Fidelity also argues that, while the trial court's second and third UDJA declarations are made against "Defendants," these declarations do not apply to Fidelity. We discern no justiciable controversy between Fidelity and Barefoot as to the principal and interest on the 2005 and 2007 Instruments or subrogation regarding the instruments, given that Fidelity was neither the lender nor servicer for the loans associated with the instruments. Accordingly, we reverse the trial court's second and third declaratory judgments as to Fidelity and conclude that Fidelity is not liable for attorney's fees under the UDJA. *Cf. Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163–64 (Tex. 2004) (under UDJA, subject-matter jurisdiction only vested if there is justiciable controversy as to rights and status of parties before court).

24

As above, however, we conclude that Fidelity is liable under section 12.002(a), which also authorizes an award of attorney's fees. Tex. Civ. Prac. & Rem. Code Ann. § 12.002(b)(3). Accordingly, we reject Fidelity's argument that no statute applies under which it may be assessed fees.

## 2. Fee segregation

We next address Fidelity's argument that Barefoot was required to segregate her attorney's fees. Our court has previously determined that, when unsegregated attorney's-fees claims are affirmed in part and reversed in part, the proper disposition is to reverse the fee award and remand for reconsideration of attorney's fees. *See O.C.T.G., LLP v. Laguna Tubular Prods. Corp.*, 557 S.W.3d 175, 193 (Tex. App.—Houston [14th Dist.] 2018, pet. dism'd by agr.). Given the disposition of the issues in this case, we reverse both the fee award and costs against Fidelity and remand the case for reconsideration. *See* Tex. R. Civ. P. 131 (awarding costs to "successful party to a suit"); *O.C.T.G., LLP*, 557 S.W.3d at 193; *see also* Tex. R. App. P. 44.1(b) (court must consider whether issues on remand are "separable without unfairness to the parties").

We sustain Fidelity's issue 4 as to reversal of the fee award; otherwise, the issue is overruled.

## VII.    BANK OF AMERICA'S APPEAL

In five issues, Bank of America contends the trial court reversibly erred by (A) granting Barefoot a declaration as to forfeiture, (B) determining Bank of America violated Civil Practice and Remedies Code section 12.002 (fraudulent liens), (C) determining Bank of America violated Finance Code chapter 392 (prohibited debt collection), and (D) awarding mental-anguish damages, and

(E) awarding attorney's fees, costs, and prejudgment interest.[17]

## A. Forfeiture declaration

In its issue A, Bank of America argues that the trial court reversibly erred by declaring that "Defendants forfeit all principal and interest for the extensions of credit associated with the 2005 Instrument and the 2007 Instrument." Bank of America argues that forfeiture may not be awarded by a declaratory judgment.

The constitution provides that "the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit . . . if the lien was not created under a written agreement with the consent of each owner and each owner's spouse, unless each owner and each owner's spouse who did not initially consent subsequently consents." *See* Tex. Const. art. XVI, § 50(a)(6)(Q)(xi). However, the supreme court has determined that "[a] declaratory-judgment action based on a constitutional right to forfeiture is not available to access the forfeiture remedy." *Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542, 551 (Tex. 2016). Instead, "just as the terms and conditions in section 50(a)(6) are not constitutional rights unto themselves, nor is the forfeiture remedy a constitutional remedy unto itself. Rather, it is just one of the terms and conditions a home-equity loan must include to be foreclosure-eligible." *Garofolo*, 497 S.W.3d at 478–79. As such, "section 50(a) does not create substantive rights beyond a defense to a foreclosure action on a home-equity lien securing a constitutionally noncompliant loan." *Wood*, 505 S.W.3d at 551.

We conclude the trial court reversibly erred in granting Barefoot declaratory relief for forfeiture under section 50(a). We sustain Bank of America's issue A.

---

[17] We identify Bank of America's issues by the lettering in its table of contents as opposed to its separate listing of issues, as the lettering more closely tracks the arguments.

**B. Section 12.002 (fraudulent liens)**

In its issue B, Bank of America challenges the trial court's determination that it violated Civil Practice and Remedies Code section 12.002. We first address Bank of America's argument that, even if the 2005 and 2007 Instruments were fraudulent liens, there is legally-insufficient evidence that Bank of America knew the liens were fraudulent. Section 12.002(a)(1) provides that a "person may not make, present, or use a document or other record *with . . . knowledge* that the document . . . is . . . a *fraudulent* lien." Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a)(1) (emphasis added). Barefoot did not present evidence that Bank of America knew that the instruments were "fraudulent," that is, created by Fidelity in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *See id.*; *see also Fraudulent Act*, Black's Law Dictionary (11th ed. 2019). Accordingly, there is legally-insufficient evidence that Bank of America presented or used the instruments with the knowledge that they were an attempt by Fidelity to "perpetrate a fraud," as opposed to made with an honest or even negligent belief in their accuracy. *See Walker & Assocs. Surveying, Inc. v. Roberts*, 306 S.W.3d 839, 849 (Tex. App.—Texarkana 2010, no pet.) (drawing distinction between document that is "factually inaccurate in some respect and one that is attempting to perpetrate a fraud"); *Young*, 102 S.W.3d at 421–22 (filing incorrect or invalid lien does not violate section 12.002 absent knowledge of fraudulence); *see also L'Amoreaux v. Wells Fargo Bank, N.A.*, 755 F.3d 748, 751 (5th Cir. 2014) ("negligence on the part of [the maker or presenter of a lien] hardly satisf[ies] the standards of § 12.002"); *In re AFGO Dev. Co., Inc.*, 625 B.R. 324, 342 (Bankr. S.D. Tex. 2020) ("Subjective knowledge that the document filed is *fraudulent*, not merely *incorrect*, is required to impose [section-12.002] liability on a filer.").

Concluding the evidence is legally insufficient to support the trial court's

judgment against Bank of America for violations of Civil Practice and Remedies Code section 12.002, we sustain Bank of America's issue B.

## C. Finance Code chapter 392 (prohibited debt collection)

In its issue C, Bank of America challenges the trial court's determination that it violated Finance Code chapter 392, which prohibits certain debt-collection practices. *See* Tex. Fin. Code Ann. §§ 392.301–.307. The trial court determined that Bank of America and Nationstar violated the following provisions of chapter 392:

> (a) In debt collection, a debt collector may not use threats, coercion, or attempts to coerce that employ any of the following practices:
>
> . . .
>
>> (8) threatening to take an action prohibited by law.

Tex. Fin. Code Ann. § 392.301(a)(8).

> (a) In debt collection, a debt collector may not use unfair or unconscionable means that employ the following practices:
>
> . . .
>
>> (2) collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer[.]

Tex. Fin. Code Ann. § 392.303(a)(2).

> (a) Except as otherwise provided by this section, in debt collection or obtaining information concerning a consumer, a debt collector may not use a fraudulent, deceptive, or misleading representation that employs the following practices:
>
> . . .
>
>> (8) misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in

28

a judicial or governmental proceeding; [or]

. . .

(12) representing that a consumer debt may be increased by the addition of attorney's fees, investigation fees, service fees, or other charges if a written contract or statute does not authorize the additional fees or charges[.]

Tex. Fin. Code Ann. § 392.304(a)(8), (12).

Bank of America argues that Barefoot's claim is barred by limitations, the trial court improperly admitted two letters Barefoot relies on, and Bank of America did not send Barefoot communications concerning "debt collection" as required under chapter 392.

### a. Limitations

Bank of America first contends Barefoot's chapter-392 claim is barred by limitations. As explained in section II, *supra*, we conclude the residual four-year statute of limitations applies to chapter-392 claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051. Barefoot filed her chapter-392 counterclaim on June 8, 2015; accordingly, we will consider actions of Bank of America beginning June 8, 2011.

### b. Evidentiary objections

We next consider Bank of America's objections to two letters from law firm Barrett Daffin Frappier Turner & Engel, LLP, sent on behalf of Bank of America. The first letter, dated September 24, 2012, gives Barefoot notice that Barrett Daffin had been retained to pursue foreclosure on her property for default on the home-equity loans. The letter begins by stating, "This law firm represents BANK OF AMERICA, N.A." In the second letter, dated October 22, 2012, Barrett Daffin responds to correspondence from Barefoot "[a]s counsel for Bank of America." Bank of America objected at trial, and argues on appeal, that these documents are

inadmissible hearsay and do not fall within the exception for admissions of a party-opponent.

An admission by a party-opponent is offered against a party and is a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship; it is not hearsay. Tex. R. Evid. 801(e)(2). For a statement of an agent to be admitted as an admission of a party-opponent, the proponent of the evidence must establish an agency relationship. *State v. Buckner Const. Co.*, 704 S.W.2d 837, 846 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). The existence of an agency relationship may be implied from the conduct of the parties or from facts and circumstances surrounding the transaction in question. *See Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 550 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Bank of America argues that Barefoot did not prove any agency relationship between Bank of America and Barrett Daffin. The record shows otherwise. The 2012 foreclosure action filed by Barrett Daffin attaches an "Affidavit in Support of Order for Foreclosure" executed by a Bank of America employee, indicating that Bank of America was represented by Barrett Daffin for purposes of foreclosing on Barefoot's property, as asserted by Barrett Daffin in its letters to Barefoot. Likewise, the 2012 action is brought on behalf of HSBC with a listed address of "C/O BANK OF AMERICA, N.A." In addition, Barefoot testified at trial that she sent Barrett Daffin's notice of foreclosure to a Bank of America employee in an attempt to resolve the situation. Finally, there is no evidence in the record that Bank of America either disputed the Barrett Daffin letter to Barefoot stating in its first line that "[t]his law firm represents BANK OF AMERICA, N.A.," or presented any evidence at trial contesting this evidence that Barrett Daffin was its

counsel.

We conclude there is sufficient evidence of an agency relationship between Bank of America and Barrett Daffin. *See Walker Ins. Servs.*, 108 S.W.3d at 550. Accordingly, the trial court did not err in admitting the letters as admissions of a party-opponent. Tex. R. Evid. 801(e)(2).

### c. Communications to collect a debt

We next consider Bank of America's argument that it did not violate chapter 392 because it did not send Barefoot communications intended to collect a debt. Instead, Bank of America contends that the communications from the Bank to Barefoot admitted at trial "merely responded to Barefoot's various requests for payment and did not demand payment," and accordingly fall outside the scope of chapter 392.[18]

As above, Bank of America, through its agent, Barrett Daffin, sent Barefoot the October 2012 notice of foreclosure, which (1) stated Barefoot's account was in default, (2) provided information about the amount due on her loan, (3) advised her that the firm had been retained "to obtain the court order required to foreclose on real property pursuant to Texas Constitution article XVI, §50(a)(6)(D)," (4) provided a telephone number for information about reinstating the home-equity loan, and (5) advised that Barefoot had the right to contest the default, acceleration, or foreclosure. After providing this information, the letter unequivocally states, **"THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT THE DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE**." We conclude this letter involves "debt collection" for

---

[18] Under chapter 392, "'Debt collection' means an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor." Tex. Fin. Code Ann. § 392.001(5).

31

purposes of chapter 392. *See* Tex. Fin. Code Ann. §§ 392.301(a), .303(a), .304(a).

We overrule Bank of America's issue C.

## D. Mental anguish

In its issue D, Bank of America argues that Barefoot did not present sufficient evidence of mental-anguish damages, preventing her from recovering on her claim under chapter 392. *See* Tex. Fin. Code Ann. § 392.403(a) ("a person may sue for (1) injunctive relief to prevent or restrain a violation of this chapter; and (2) actual damages sustained as a result of a violation of this chapter"); *Hingst v. Providian Nat. Bank*, No. 14-02-01150-CV, 2003 WL 21467093, at *1 n.6 (Tex. App.—Houston [14th Dist.] June 26, 2003, no pet.) (mem. op.) (citing section 392.403(a) and stating that actual damages are element of chapter-392 claim).

As above, there must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded. *Saenz*, 925 S.W.2d at 614. Mental anguish is only compensable if it causes a "substantial disruption in . . . daily routine" or "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway*, 901 S.W.2d at 444. Even when an occurrence is of the type for which mental-anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required. *Guerra*, 348 S.W.3d at 231.

Barefoot testified that Bank of America first raised the possibility of foreclosure during a March 2012 phone call following the unsuccessful sale of the property:

Q. Did you return any signed short sale agreement by an April 2nd deadline?
A. No.
Q. Were you aware—had anybody told you at Bank of America that

32

there was going to be a short sale that was in the process of happening?

A. No.

Q. What did you understand would be the repercussion, though, after reading this letter if you didn't return those documents signed?

A. By this time there had already been some discussion about foreclosure. So this was—

Q. When was the first time that you recall anybody bringing up the prospect of a foreclosure on your home?

A. In March of 2012.

Q. Who did you hear that from?

A. That was someone from Bank of America calling me. By this time there were so many different—there were contractors, there were people calling me, there were me calling them, there were letters, there were—I mean, it was just a whirlwind at this point.

Q. What was your reaction when you heard a foreclosure may be in the air for your home?

A. Well, my reaction was that—that's when everything became even—it was panic. It was like a panic. And so I just—now just kind of ramped up, trying to document everything. And, quite frankly, because I had never been through this before, I was just trying to learn as I went, trying to learn what I needed to do, where I might get help because obviously Bank of America wasn't helping me.

The factfinder could conclude from this testimony that Bank of America began threatening foreclosure in March 2012 as a "repercussion" of Barefoot not signing sale documents. Because the 2007 Instrument was void for not being signed by all owners of the property, Bank of America's threats that it could foreclose based on that instrument violate section 392.301(a)(8), which prohibits "threatening to take an action prohibited by law." Tex. Fin. Code Ann. § 392.301(a)(8); *see McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 477 (5th Cir. 2015) ("threatening to foreclose absent any right to do so" is "an action prohibited by law" under section 392.301(a)(8)).

33

Barefoot testified as to the following incidents in the following months:

- When she received a letter from Bank of America in May 2012 that she felt did not address her concerns, she felt "devastated," "felt like I was pulling my hair out and I was going crazy, literally," and characterized the process as a "complete nightmare";

- She felt so "angry" and "exhausted" after she received the May 2012 letter that she went to a Bank of America branch to speak to someone in person; and

- After further interactions with Bank of America in June 2012, she felt "deflated," "[a]bsolute exhaustion," not "physically well," and "like I just can't trust anyone."

This chain of events culminated in the September 2012 foreclosure notice sent by Barrett Daffin on behalf of Bank of America. Barefoot testified that, after receiving the notice, she "went into complete panic. My basic survival skills that are human to us, just having some type of shelter, something, went into overdrive and panic. And what do I do now?"

We conclude Barefoot met her burden to prove "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway*, 901 S.W.2d at 444; *see Patel v. Hussain*, 485 S.W.3d 153, 178 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Proof of mental anguish may include painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings.") (quotation omitted); *see also McCaig*, 788 F.3d at 483 ("panic" over threat of foreclosure supported award of mental-anguish damages under chapter 392). Likewise, the evidence above concerning Barefoot's months-long ordeal is sufficient to show the nature, duration, and severity of Barefoot's mental anguish, *see Guerra*, 348 S.W.3d at 231, and the trial court's

award of $75,000 "fairly and reasonably" compensates Barefoot for that anguish. *Saenz*, 925 S.W.2d at 614; *see McCaig*, 788 F.3d at 484 (affirming mental-anguish award of $75,000 to each of two plaintiffs for mental anguish stemming from prohibited debt collection relating to foreclosure). Finally, we note that Barefoot was the only witness at trial, and no evidence was presented challenging her account of her mental anguish. We defer to the credibility determinations of the factfinder, particularly when it comes to mental anguish. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003) ("[W]hether to award [mental-anguish] damages and how much is uniquely within the factfinder's discretion."). We overrule Bank of America's issue D.

**E. Attorney's fees, costs, and prejudgment interest**

In its issue E, Bank of America argues the trial court's awards of attorney's fees, costs, and prejudgment interest should be reversed. As explained in section VI.E.2, *supra*, we reverse the award of attorney's fees and costs and remand to the trial court for reconsideration. As for prejudgment interest, Bank of America argues this award should be reversed because Barefoot is not the prevailing party as to any of her claims. We disagree, having affirmed the trial court's judgment against Bank of America on Barefoot's chapter-392 claim.

We sustain Bank of America's issue E as to attorney's fees and costs and overrule it as to prejudgment interest.

## VIII. HSBC AND NATIONSTAR'S APPEAL

In eight issues in their joint appellate brief, HSBC and Nationstar argue the trial court reversibly erred by (1) declaring the instruments void, (2) declaring HSBC and Nationstar must forfeit any principal and interest associated with the instruments, (3) declaring HSBC and Nationstar are not entitled to be subrogated to

the 2005 Instrument, (4) determining Nationstar violated chapter 392 (prohibited debt collection), (5) determining HSBC and Nationstar violated section 12.002 (fraudulent liens), (6) awarding attorney's fees, (7) awarding costs, and (8) awarding prejudgment interest.

## A. Declaration that 2005 and 2007 Instruments are void

In their issue 1, HSBC and Nationstar argue that the trial court reversibly erred in declaring the 2005 and 2007 Instruments void for noncompliance with the Texas Constitution. For the reasons stated in section V, *supra*, we overrule this issue.

## B. Declaration regarding forfeiture of principal and interest

In their issue 2, HSBC and Nationstar argue that the trial court reversibly erred by declaring that "Defendants forfeit all principal and interest for the extensions of credit associated with the 2005 Instrument and the 2007 Instrument." For the reasons stated in section VII.A, *supra*, we sustain this issue.

## C. Declaration regarding subrogation

In their issue 3, HSBC and Nationstar argue the trial court reversibly erred by granting Barefoot a declaratory judgment that "Defendants are not entitled to contractual or equitable subrogation based on the transactions associated with the 2005 Instrument and the 2007 Instrument." In its original petition in this lawsuit, HSBC sought declaratory relief regarding subrogation on the grounds that "the [2007 Instrument] is contractually subrogated the rights, superior title, liens and equities of the [2005 Instrument] in favor of [HSBC]."

HSBC contends the trial court reversibly erred by declaring HSBC is not entitled to subrogation, basing its issue on arguments that the instruments are not void. We have already rejected these arguments in section V, *supra*, and we

likewise overrule HSBC's challenge to the subrogation declaration on the same grounds.

Nationstar argues there is no justiciable controversy as to Nationstar. We agree. Only HSBC sought subrogation as part of this action, and we discern no justiciable controversy between Nationstar and Barefoot on that issue.

We overrule HSBC and Nationstar's issue 3 as to HSBC and sustain it as to Nationstar.

## D. Finance Code chapter 392 (prohibited debt collection)

In its issue 4, Nationstar challenges the trial court's determination that it violated Finance Code chapter 392.[19] We first address Nationstar's argument that Barefoot cannot recover against it for prohibited debt collection because she has shown no evidence of damages. *See* Tex. Fin. Code Ann. § 392.403(a) (plaintiff may seek injunctive relief or "actual damages"); *Hingst*, 2003 WL 21467093, at *1 n.6 (actual damages are element of chapter-392 claim).

The trial court awarded mental-anguish damages against Nationstar for violations of chapter 392. The only evidence Barefoot cites as supporting her claim for mental anguish caused by Nationstar is her testimony that she felt like her "head is exploding" and felt "sick, like I am going to throw up" after she received, as part of a file of documents she requested from Nationstar, a letter from Barrett Daffin to Nationstar stating that Barefoot was not the sole owner of the property. Nationstar's letter to Barefoot enclosing the documents, however, simply states it is sending Barefoot documents per her request, and the Barrett Daffin letter included in the documents is not a communication to Barefoot. Neither of these is a communication involving "debt collection" or a request for information from a

---

[19] This claim was not asserted against HSBC.

consumer as required by the relevant provisions of chapter 392. *See* Tex. Fin. Code Ann. §§ 392.301(a), .303(a), .304(a).

Concluding the evidence is legally insufficient to support the trial court's award of mental-anguish damages against Nationstar for violations of chapter 392, we sustain Nationstar's issue 4.

**E. Civil Practice and Remedies Code section 12.002 (fraudulent liens)**

In their issue 5, HSBC and Nationstar challenge the trial court's determination that they violated Civil Practice and Remedies Code section 12.002. We first address their argument that, even if the 2005 and 2007 Instruments were fraudulent liens, there is legally-insufficient evidence that they knew the liens were fraudulent. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a)(1). As discussed in section VII.B, *supra*, we agree. Barefoot did not present evidence that HSBC and Nationstar knew that the instruments were "fraudulent," that is, created by Fidelity in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *See id.*; *see also Fraudulent Act*, Black's Law Dictionary (11th ed. 2019). Accordingly, there is legally-insufficient evidence that HSBC or Nationstar presented or used the instruments with the knowledge that they were an attempt by Fidelity to "perpetrate a fraud." *See Walker & Assocs. Surveying*, 306 S.W.3d at 849 (drawing distinction between document that is "factually inaccurate in some respect and one that is attempting to perpetrate a fraud"); *see also L'Amoreaux*, 755 F.3d at 751 ("negligence on the part of [the maker or presenter of a lien] hardly satisf[ies] the standards of § 12.002"); *AFGO Dev. Co.*, 625 B.R. at 342 ("Subjective knowledge that the document filed is *fraudulent*, not merely *incorrect*, is required to impose [section-12.002] liability on a filer.").

Concluding the evidence is legally insufficient to support the trial court's judgment against HSBC and Nationstar for violations of Civil Practice and

Remedies Code section 12.002, we sustain their issue 5.

## F. Attorney's fees, costs, and prejudgment interest

In issues 6, 7, and 8, HSBC and Nationstar challenge the trial court's awards of attorney's fees, costs, and prejudgment interest. Regarding fees, as we have affirmed the trial court's declaratory judgment against HSBC concerning subrogation, for the reasons explained in section VI.E.2, *supra*, we reverse and remand the awards of attorney's fees against HSBC for reconsideration. As we have reversed all claims against Nationstar supporting an award of attorney's fees, we reverse the award of fees and remand with instructions that Barefoot take nothing in attorney's fees from Nationstar.

As to costs, as explained in section VI.E.2, *supra*, we reverse the awards of costs against HSBC and Nationstar and remand for reconsideration. And having reversed the trial court's award of actual damages against HSBC and Nationstar, we likewise reverse the trial court's awards of prejudgment interest, and remand with instructions that Barefoot take nothing in prejudgment interest from HSBC or Nationstar.

We sustain issues 6, 7, and 8 in part as explained above; the issues are otherwise overruled.

## IX. CONCLUSION

Having sustained, in whole or in part, Fidelity's issues 2, 3, and 4, Bank of America's issues A, B, and E, and HSBC and Nationstar's issues 2 through 8, we:

- reverse the trial court's judgment as to its declaration that "Defendants forfeit all principal and interest for the extensions of credit associated with the 2005 Instrument and the 2007 Instrument";

- reverse, as to Fidelity, Bank of America, and Nationstar, the trial court's judgment as to its declaration that "Defendants are not entitled to contractual or equitable subrogation based on the transactions associated with the 2005 Instrument and the 2007 Instrument";

- reverse the trial court's judgment that Bank of America, HSBC, and Nationstar violated Civil Practice and Remedies Code section 12.002 (fraudulent liens);

- reverse the trial court's judgment that Nationstar violated Finance Code chapter 392 (prohibited debt collection);

- reverse the trial court's judgment as to its award of $104,000 against Fidelity in actual damages;

- reverse the trial court's judgment as to its awards of mental-anguish damages against Fidelity ($225,000), HSBC ($100,000), and Nationstar ($50,000);

- suggest a remittitur of $319,000 as to damages for Barefoot's claim against Fidelity for violation of Civil Practice and Remedies Code section 12.002 (fraudulent liens). If accepted no later than November 12, 2021, we will modify the trial court's judgment to reflect an award of $10,000 on this claim against Fidelity and affirm that portion of the judgment as so modified; otherwise, the trial court's judgment as to Barefoot's claim against Fidelity for violation of section 12.002 shall be reversed;

- reverse the trial court's judgment as to its awards of prejudgment interest as to Fidelity, HSBC, and Nationstar;

- reverse the trial court's judgment as to its awards of attorney's

40

fees; and

- reverse the trial court's judgment as to its awards of costs.

We otherwise affirm the trial court's judgment as challenged on appeal. We remand the case to the trial court with the following instructions and limited to the following proceedings:

- with instructions that the trial court render judgment that Barefoot take nothing by her claim for a declaratory judgment that "Defendants forfeit all principal and interest for the extensions of credit associated with the 2005 Instrument and the 2007 Instrument";

- with instructions that the trial court render judgment that Barefoot take nothing from Fidelity, Bank of America, and Nationstar by her claim for a declaratory judgment that "Defendants are not entitled to contractual or equitable subrogation based on the transactions associated with the 2005 Instrument and the 2007 Instrument";

- with instructions that the trial court render judgment that Barefoot take nothing from Bank of America, HSBC, and Nationstar by her claim for violations of Civil Practice and Remedies Code section 12.002 (fraudulent liens);

- with instructions that the trial court render judgment that Barefoot take nothing from Nationstar by her claim that Nationstar violated Finance Code chapter 392 (prohibited debt collection);

- for a new trial limited to liability and damages on Barefoot's claim against Fidelity for violation of Civil Practice and Remedies Code section 12.002 (fraudulent liens), if Barefoot does not timely file our suggested remittitur;

- for reconsideration and rendition of judgment on the award of prejudgment interest as to Fidelity and with instructions that the trial court render judgment that Barefoot take nothing from HSBC or Nationstar in prejudgment interest;

- for reconsideration and rendition of judgment on the awards of attorney's fees as to Fidelity, HSBC, and Bank of America, and

with instructions that the trial court render judgment that Barefoot take nothing from Nationstar in attorney's fees; and

- for reconsideration and rendition of judgment on the trial court's awards of costs.




/s/     Charles A. Spain
       Justice

Panel consists of Justices Spain, Hassan, and Poissant (Poissant, J., concurring and dissenting).